# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Independent School District No. 283,

                    Civil No. 18-935 (DWF/LIB)

     Plaintiff,

v.

                   **MEMORANDUM**
                 **OPINION AND ORDER**

E.M.D.H., a minor, by and through her
parents and next friends, L.H. and S.D.,

     Defendants.

_____

Peter A. Martin, Esq., Knutson, Flynn & Deans, PA, counsel for Plaintiff.

Amy J. Goetz, Esq., and Andrea L. Jepsen, Esq., School Law Center, LLC, counsel for
Defendants.

_____

## INTRODUCTION

In this action, Independent School District No. 283 (the "District") requests
judicial review and reversal of a March 16, 2018 decision (the "Decision") issued by an
administrative law judge ("ALJ").  (Doc. Nos. 1 ("Compl."), 2 ("Decision").)  The
Decision ruled in favor of the parents of a high-school the student who lodged a due
process complaint under the Individuals with Disabilities Education Act, 20 U.S.C.
§ 1400, *et seq.* ("IDEA").  This matter is before the Court on cross motions for judgment
on the administrative record.  (Doc. Nos. 85, 89.)  For the reasons set forth below, the
Court grants Defendants' motion in part, affirming the ALJ's decision but modifying the
remedies.

## BACKGROUND

Defendants E.M.D.H. (the "Student"), a minor, by and through her parents and next friends, L.H and S.D. (the "Parents") (together "Defendants") assert that the Student, a sixteen-year old junior in high school, has been denied her right to a free and appropriate education under the IDEA. In short, Defendants submit that the Student went years without special education and related services because she was not properly classified as having a disability. The Parents hired a private educational team to design and implement an individualized education program. In June 2017, Defendants initiated an administrative hearing to correct the conditions and restore the Student's education. On March 16, 2018, the ALJ issued a 67-page decision in favor of the Parents. The District now asks the Court to reverse the Decision.

## I.       Elementary School

The Student began attending school in the District beginning in 2006. During elementary school, the Student performed well academically, socially, and on measures of self-management. In the fourth grade, the Student's teacher stated that she "is a joy to teach," "has a great sense of humor," and "is a delight to be around." (Doc. No. 60-2 at 21.) From elementary school through the time of the Decision, the Student has never had a discipline referral noted in her record. (Docs. No. 60-2 at 45-53, 60-3 at 1.) The Student has always excelled academically. For example, in the fifth grade, the Student enrolled in an advanced math class at the middle school.

The Student has had attendance problems since elementary school though. During elementary school, the Student averaged around eight absences per school year. (Doc.

No. 72-5 at 42-44.)  Nevertheless, the Student continued to perform well academically during those years.  (*See* Doc. No. 60-2 at 12-13, 17-26, 36-38, 41-44.)

Although the Student performed well in elementary school, she has had behavioral meltdowns since she was four years old.  Her behavioral meltdowns were characterized by hitting, biting, pinching, crying, throwing objects, and banging on walls.  (Doc. No. 61-7 at 4.)  The meltdowns would last from a few minutes to several hours, and would sometimes occur multiple times per day or not at all for multiple weeks.  (*Id.*)  Beginning in 2008, when the Student was in second grade, the Student's mother took the Student to the Washburn Center for Children, where the Student was diagnosed with adjustment disorder with mixed disturbance of emotion and conduct, and received therapy until discharged on July 23, 2009.  Since 2008, the Student has carried several diagnoses from various health care professionals, and she is currently diagnosed with: generalized anxiety disorder, school phobia, unspecified obsessive-compulsive disorder ("OCD") (or autism spectrum disorder ("ASD")), panic disorder with agoraphobia, attention deficit hyperactivity disorder ("ADHD"), primarily inattentive type, and severe recurrent major depressive disorder.  (Doc. No. 60-1 at 20.)

## II.    Middle School

The Student remained enrolled in the District for middle school.  In middle school, the Student participated in the Gifted and Talented programming and earned A's and B's in her classes.  In sixth grade, teachers commented on the Student's performance: "Gifted writer"; "insightful social studies student"; and "Always prepared, and engaged, great end to the year."  (Doc. No. 60-2 at 12-13.)  In seventh grade, teachers commented:

"Hard worker"; "Great job despite the absences"; "Showed lots of hard work this spring"' and "Great participation." (*Id.* at 17.) The Student excelled on her sixth and seventh grade standardized tests. The Student's attendance issues continued, however, with her missing 18 days of school in sixth grade and 20 days in seventh grade.

When the Student began eighth grade in the fall of 2014, she told her mother that she was afraid to go to school. From the beginning of the school year through February 2015, she missed 18 days of school. (*Id.* at 12; Doc. No. 72-5 at 45.) In March 2015, the Student stopped attending school altogether. (Doc. Nos. 60-1 at 26, 62 at 13.) On May 6, 2015, the Student completed a psychiatric evaluation at Prairie Care Medical Group in Edina, Minnesota. (Doc. No. 56-9 at 9.) The Student was diagnosed with depression not otherwise specified and generalized anxiety disorder. (*Id.*) On May 18, 2015, the Student was admitted to the Prairie Care day treatment program; she was discharged on June 12, 2015. (*Id.* at 17.)

When the Student stopped attending school, one of her teachers brought her concern to a group of teachers called the Orange Academy, which consisted of ten people, including the Student's teachers and Gina Magnuson, the Dean of Students. (Doc. No. 60-4 at 13.) The teachers discussed what to do about the Student's grades given she was not attending school. (*Id.*) It was decided to give her "incompletes" as opposed to failing grades. (*Id.*) The group also decided not to refer the Student to the District's Student Intervention Teacher Team ("SITT"), which is one of the District's child-find activities. (*See, e.g.*, *id.* at 32.) The group decided not to refer the Student because her grades were excellent when she attended school. Staff at the middle school

were aware of the Student's mental health issues and that the Student had been admitted to the Prairie Care day treatment program.

As a result of her absences, the Student received no fourth quarter credit or grades in eighth grade, and the District dis-enrolled the Student that spring. (Doc. No. 54-3 at 16; Doc. No. 54 at 5.)

## III. High School

When the Student began high school, her ninth-grade guidance counselor, Barb Nelson, offered to meet the Parents to re-enroll the Student, and to meet the Student to get to know her, but did not address the issue of special education or evaluation. (Doc. No. 72-5 at 59.) Then, shortly after beginning ninth grade, the Student's attendance became irregular. Eventually in November 2015, she was admitted again to the Prairie Care day treatment program, and the District again dis-enrolled her. (Doc. No. 55-6 at 36.)

The Student re-enrolled on December 15, 2015. On April 26, 2016, the District discussed referring the Student for a special education evaluation. (Doc. No. 60-4 at 7.) The District did not make a referral, but instead Nelson called the Student's mother to explain various options for special education placement for the Student. According to the Parents, however, Nelson did not inform the Student's mother that special education services would allow the Student to continue taking honors courses. (Doc. No. 54 at 21.)

On June 6, 2016, near the end of the Student's freshman year, she was admitted to the Rogers Memorial Hospital ("Rogers") in-patient program in Oconomowoc, Wisconsin. (Doc. No. 62-4 at 5.) At Rogers, the Student took some education-related

assessments, including the WRAT-3, on which she scored in the post-high school level for reading, spelling, and math. (Doc. Nos. 62-9 at 21, 62-6 at 2, 75 at 9-10.) Also while at Rogers, the Student was diagnosed with ADHD – Inattentive type, and was prescribed Adderall XR. (Doc. No. 62-7 at 27.)

When the Student began her sophomore year, the District created a Section 504 plan for the Student, even though it had never conducted an evaluation of her. The 504 plan involved providing the Student extra time on assignments, adjustments to workload to prevent falling behind, regular check-ins with teachers, breaks from the classroom and a pass to the counseling office, and the use of a fidget. (*See* Doc. Nos. 60-5 at 72, 60-6 at 21.) Despite having a 504 plan, the Student's English teacher denied her extra time to complete an assignment with which she was having difficulty. (Tr. at 1025-27.) As a result of the Student's frustration with the English class, Defendants agree with the Student's tenth-grade counselor, Heidi Cosgrove, and the school social worker, Marlee Nirenstein, to switch the Student to an online English course. (Doc. No. 60-5 at 69; Tr. at 1032-33, 1200.) By December 5, 2016, however, the Student was again dis-enrolled by the District because she had missed 15 or more days of school in the semester. (Doc. No. 60-6 at 1.)

The Student and the Student's mother met with Cosgrove and Nirenstein in January 2017 to discuss the possibility of special education services. Cosgrove explained that if the Student were eligible for special education, then she would need to be instructed in academic and organizational skills in a structured study hall setting. (Tr. at 1050-51, 1212.) Cosgrove and Nirenstein also indicated that the Student would be

assigned a new social worker along with a case manager.  (Tr. at 1050-51.)  Although Cosgrove and Nirenstein did not expressly say it, the Student's mother understood them to be suggesting that special education would not be an appropriate placement for the Student because she is talented and gifted.  (Tr. at 1448-49.)  The District did not propose a special education evaluation at the time; the Parents did not request one.  (Tr. at 1449.)  Then, after attending only the first day of the semester, the Student was eventually dis-enrolled again on February 16, 2017.  On April 25, 2017, the Student was again admitted to Rogers.

On April 28, 2017, the Parents requested that the District evaluate the Student's eligibility for special education.  On May 23 and 24, 2017, while still at Rogers, Dr. Denise K. Reese conducted a comprehensive psychological evaluation of the Student. Dr. Reese diagnosed the Student with:  major depressive disorder, recurrent, in partial remission; ASD; ADHD, predominantly inattentive presentation; and generalized anxiety disorder with panic and OCD features, features of borderline personality disorder.  (*See* Doc. No. 59-6 at 10.)  Dr. Reese also made several educational recommendations to accommodate the Student's anxiety and ASD, including an individualized curriculum, providing the Student a resource room to go to when she is feeling anxious or upset, and reducing requirements for the Student to socialize in large groups during the academic day.  (*Id.*)  The Student's mother paid $2,430 for Dr. Reese's evaluation.  (Doc. No. 56-1 at 4.)

In June 2017, the Student re-enrolled in the District as a junior.  On June 14, 2017, the District held an evaluation planning meeting.  (Doc. Nos. 60-6 at 57-61, 60-7 at 1-10.)

The Student's mother was provided a notice of her parent rights under special education law. (Doc. No. 54-6 at 22-39.) Meeting attendees determined that the Student should be evaluated under the categories of ASD, EBD, and other health disability ("OHD"). The Parents' counsel also informed the District of Dr. Reese's evaluation and requested that the District rely upon the information rather than have the Student retested in the same areas. The District agreed to do so. The evaluation plan also included three classroom observations of the Student. (Doc. Nos. 60-6 at 57-61, 60-7 at 1-10.) The District conveyed the plan to the Parents on June 20, 2017. (*Id.*) The Parents consented to proceed with the evaluation. The District had 30 school days, or until October 16, 2017, to complete the evaluation. (*Id.*)

On August 31, 2017, The Parents met with school officials to discuss the Student's junior year. School officials presented four options for the Student: (1) full days with advanced level classes; (2) full days with no advanced level classes; (3) partial school days; and (4) participation in the PAUSE program, which is an alternative learning environment supported by a teacher and social worker. The District also proposed the Student having access to PLATO, an online learning platform through which the Student could progress at her own pace and earn class credits. (Doc. No. 61-6 at 5-7.) The Student and the Parents chose to pursue the PAUSE and PLATO route.

On September 6, 2017, the Student began her junior year attending PAUSE. Her teacher, Bob Logan, indicated that the Student worked steadily on PLATO from 10:00 a.m. to 11:30 a.m. without a break. (Doc. No. 61-6 at 27-35.) The Student was organized, focused, taking notes, but was also receptive, made eye contact, and was

pleasant and affirming with Logan. (*Id.*) She sat with Logan and the social worker over lunch, during which time she was conversational, polite, and social. (Tr. at 162.) The Student worked diligently that afternoon, but the next morning, she went home sick after working for only an hour and a half. (*Id.* at 163, 167-68, 174.) The Student returned to PAUSE only one more time—the next day—during which time she worked consistently on PLATO assignments. (*Id.* at 169-170.) After the third day, the Student did not return to PAUSE. At the Student's mother's suggestion, Logan left voicemails on the Student's cell phone encouraging her to return to PAUSE.

## IV. Special Education Evaluation

On October 16 and 24, 2017, District presented the results of its evaluation to the Parents. (Doc. No. 61-6 at 8-11.) The District never completed a functional behavioral assessment ("FBA") of the Student. (Tr. at 899.) The District concluded that the Student did not qualify for special education in the ASD, EBD, or OHD categories. (Doc. No. 61-6 at 8-11.) The Parents disagreed. The Parents then requested that the District consider applying the override criteria to the District's eligibility determination. Because the District viewed the results as valid, the District determined that the override criteria were not applicable and that the Student did not need special education. (Tr. at 807, 842-45, 849.)

The District determined the Student did not meet the definition of EBD because she does not exhibit a specific emotional or behavioral response that adversely affects educational performance. (Doc. No. 55-7 at 22.) The District further concluded that the Student's intrapersonal impairment does not severely interfere with her educational

performance because, in part, it has not manifested in the classroom. (*Id.*) The District also determined that the Student did not meet the definition of OHD because neither her ADHD nor her anxiety adversely affects her ability to complete educational tasks within routine timelines, and that her ADHD and anxiety have not resulted in a pattern of unsatisfactory educational progress. (*Id.* at 26, 28.) On November 21, 2017, the District provided the Parents with a final report, concluding that the Student was not eligible for special education. (Doc. No. 55-6 at 32.)

## V.     Independent Educational Evaluation

On November 8, 2017, the Parents hired Dr. Richard Ziegler, Dr. L. Read Sulik, and Wendy Selnes to conduct various components of an independent educational evaluation ("IEE"). On or about November 29, 2017, the Parents hired Heather Lindstrom from Beyond Risk Youth, LLC, to conduct another component of the IEE.

Dr. Ziegler conducted a neuropsychological exam. (Doc. No. 56-2 at 14.) He diagnosed the Student with generalized anxiety disorder, school phobia, unspecified OCD, and severe recurrent major depressive disorder. (Doc. No. 56-3 at 17.) Selnes conducted a partial FBA after reviewing the Student's school records, treatment history, and observations of the Student. (*Id.* at 36.) Selnes concluded that the Student exhibited behaviors that "provide automatic reinforcement relative to regulation of her internal status as well as to escape aversive social or other situations." (Doc. No. 56-4 at 4.) Lindstrom assessed the Student to design and implement an instructional program for the Student. (*Id.* at 15.) Lindstrom also began providing the Student with private academic tutoring. (*Id.* at 28.) Lindstrom recommended that the Student be exposed to more

rigorous academic work, gain access to post-secondary resources, and learn how to filter and manage sensory input, among other things. (Doc. No. 56-5 at 8.) Dr. Sulik conducted a psychiatric assessment of the Student. As part of his assessment, he identified several categories of treatment objectives for the Student, including: (1) reduce depression, anxiety, ADHD, and sleep and fatigue symptoms; and (2) improve internal, physical, external, and spiritual world wellness practices. (Doc. No. 60-1 at 21.) Dr. Sulik also found that residential treatment was not necessary at the time because the Student was having success with her then-current programming.

The Parents incurred fees for the IEE components in the amounts of: $8,776.80 for Dr. Ziegler, (Tr. at 1137-38); $6,707 for Selnes (*Id.* at 1159); $2,250 for Dr. Sulik (Doc. No. at 60-1 at 37); and $3,475 for Lindstrom, (Doc. No. 56-5 at 41).

Following the IEE, the District hired Dr. William Dikel to assist the District staff "in clarifying the nature and extent of [the Student's] mental health difficulties, especially as they related to her educational issues." (Doc. No. 63-9 at 13.) Dr. Dikel described the Student's history of diagnosis and treatment as "complex, confusing and at times contradictory," but noted that there are a number of pertinent issues. (*Id.* at 51.) Dr. Dikel noted that the various mental health professionals treating the Student appear to be doing so without communicating with each other or referencing each other's files. Dr. Dikel also observed that the medications that the Student has been prescribed may be contributing to her symptoms of anxiety, mood abnormalities, and chronic sleep problems. (*Id.* at 52.) In reviewing the Student's family situation, Dr. Dikel found that the Student's "dysfunctional family dynamics are not the primary causal factor in [the

Student's] school refusal, but may very well be contributing factors." (Doc. No. 64 at 1.)

Dr. Dikel ultimately recommended that the Parents play a pivotal role in overseeing

services provided by medical, mental health, education, and county services providers.

(*Id.* at 3.) He also recommended a more thorough assessment to assess other potential

diagnoses. (*Id.* at 5.)

## VI. Procedural History

On June 27, 2017, the Parents requested a special education due process hearing

with the Minnesota Department of Education ("Department" or "MDE"). (Decision at 1.)

During a prehearing conference, the ALJ and parties identified four issues pending for the

hearing: (1) whether the District conducted an appropriate evaluation of the Student,

consistent with 34 C.F.R. §§ 300.304-.306 and Minn. R. 3525.2710; (2) whether the

Student is eligible for special education and related services; (3) whether the District

timely identified the Student as a possible child with a disability under the IDEA; and

(4) whether the District failed to provide the Student a free appropriate public education

("FAPE") because it did not timely and appropriately identify and evaluate the Student,

determine her eligible, and provide her with special education and related services

designed to enable her to make progress appropriate in light of her circumstances. (*Id.*)

The parties agreed to continue the hearing to allow the District time to complete its

evaluation of the Student, present a proposed individualized education plan ("IEP") to the

Parents, and hold an IEP team meeting. (*Id.*) After subsequent prehearing conferences,

the hearing began on January 16, 2018 and lasted seven days. (*Id.* at 4.) The ALJ heard

testimony from 20 witnesses—five called by the Parents, and 15 called by the District. (*Id.*) The Parents entered 38 exhibits into the record; District entered 39 exhibits. (*Id.*)

On March 16, 2018, the ALJ issued the Decision, requiring Plaintiff to immediately change the Student's educational placement by providing her a FAPE consisting of special education and related services, at public expense, until her graduation. As part of the Decision, the ALJ reached the following conclusions:

1. The School District failed to conduct an appropriate evaluation of Student when it did not complete required assessments and failed to reach appropriate conclusions about Student's eligibility. Parents are entitled to reimbursement for their IEE as a matter of law.

2. Student is eligible for special education and related services under the IDEA because her condition meets the definition of serious emotional disturbance/emotional behavioral disorder ("EBD") and other health impairment ("OHI")/other health disabilities ("OHD").

3. The School District failed to timely identify Student as a possible child with a disability when Student refused to consistently attend school during eighth grade as a result of her deteriorating mental health.

4. The School District denied Student a FAPE when it did not timely and appropriately identify and evaluate her, determine her eligible, and provide her with special education and related services designed to enable her to make educational progress appropriate in light of her circumstances. Student is entitled to services appropriate to address her loss of educational benefit, including her lack of credits toward graduating, and teaching her skills to cope effectively with her disabilities.

(*Id.* at 4-5.) The District then initiated the present action seeking judicial review of the Decision and to reverse the findings therein. Both parties now move for judgment on the administrative record. (Doc. Nos. 85, 89.)

# ANALYSIS

## I.    Standard of Review

"A Motion for Judgment on the Record, in the context of the IDEA, is a request that the Court enter a final Judgment in what is essentially a bench trial on a stipulated record." *Slama v. Indep. Sch. Dist. No. 258*, 259 F. Supp. 2d 880, 882 (D. Minn. 2003). The IDEA provides that a court reviewing a state administrative decision "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); *see also Sneitzer v. Iowa Dep't of Educ.*, 796 F.3d 942, 948 (8th Cir. 2015) (noting that when reviewing administrative decisions, "[t]he district court must make its decision independently, based on a preponderance of the evidence, as to whether the IDEA was violated"). Thus, "the district court must 'independently determine whether the child [in question] has received a FAPE.'" *K.E. ex rel. K.E. v. Inep. Sch. Dist. No. 15*, 647 F.3d 795, 803 (quoting *CJN v. Minneapolis Pub. Sch.*, 323 F.3d 630, 636 (8th Cir. 2003)). At the same time, courts should give the ALJ's decision "due weight." *Id.* (quoting *Indep. Sch. Dist. No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 561 (8th Cir. 1996)). The Eighth Circuit has emphasized that the court's "review is not necessarily de novo," and that a court "should not substitute its judgment for that of the school officials." *Sneitzer*, 796 F.3d at 948.

The "limited grant of deference" under this standard "is appropriate in IDEA cases because the ALJ 'had an opportunity to observe the demeanor of the witnesses and

because a [district] court should not substitute its own notions of sound educational policy for those of the school authorities that [it] review[s].'" *K.E. ex rel. K.E.*, 647 F.3d at 803 (quoting *CJN*, 323 F.3d at 636). The Eighth Circuit has noted that "[t]his somewhat 'unusual' standard of review is less deferential than the substantial-evidence standard commonly applied in federal administrative law." *Id.* (quoting *Indep. Sch. Dist. No. 283*, 88 F.3d at 561). "Whether a child has received a FAPE is a mixed question of law and fact." *Id.* at 804. A court may render a decision on the administrative record even where "disputed issues of material fact" are present. *Indep. Sch. Dist. No. 283*, 88 F.3d at 561. Here, the burden is on the Plaintiffs as they are "challenging the IEP" and "the outcome of the administrative . . . decision." *Lathrop R-II Sch. Dist. v. Gray ex rel. D.G.*, 611 F.3d 419, 423 (8th Cir. 2010); *Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 658 (8th Cir. 1999).

## II.    IDEA

States that accept federal funding under the IDEA must make a FAPE available to every child with a disability in their state. 20 U.S.C. § 1412(a)(1)(A). The IDEA defines a FAPE as "special education and related services that" meet specific statutory requirements, including being implemented consistent with the student's IEP. 20 U.S.C. § 1401(9). As the Supreme Court recently reiterated, "[t]he IEP is 'the centerpiece of the statute's education delivery system for disabled children.'" *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). An IEP is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with" the IDEA's requirements.

20 U.S.C. § 1414(d)(1)(A)(i).  The IDEA's procedural requirements for developing a student's IEP "emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances."  *Endrew F.*, 137 S. Ct. at 994.  In addition, "the IDEA requires that children with disabilities receive education in the regular classroom 'whenever possible.'"  *Id.* at 999 (citation omitted); *see also* 20 U.S.C. § 1412(a)(5)(A) (providing for education of children with disabilities in the mainstream alongside children without disabilities "[t]o the maximum extent appropriate").

The District argues the ALJ erred in six respects:  (1) concluding that the Student is eligible for special education; (2) concluding that the District failed to meet its child-find obligations; (3) concluding that Defendants are entitled to reimbursement of IEE fees; (4) concluding that Defendants are entitled to reimbursement of Dr. Reese's fees; (5) ordering, as compensatory education, the District to pay for private consultation and services for the Student until she graduates; and (6) ordering the Student's IEP team to meet quarterly until she graduates.

## A.    Eligibility

The District argues that the Decision erroneously faults the District's eligibility evaluation for (1) failing to conduct systematic observations of the Student in a classroom and (2) failing to conduct an FBA.  The ALJ reached the conclusion that the "District did not conduct all of the state-required assessments required for examining whether a child is eligible under the category of EBD and OHD.  The School District did not conduct any systematic observations in the classroom or other learning environments and an FBA.

The School District failed to alternatively use the team override provision." (Decision at 22.)

Federal and state law establish standards for evaluations for determining eligibility under the IDEA. Under Minnesota law, school districts must "use technically sound instruments that are designed to assess the relative contribution of . . . behavioral factors." Minn. R. 3525.2710, subp. 3(B)(3). With respect to EBD, evaluators must include data from:

> (1) clinically significant scores on standardized, nationally normed behavior rating scales; (2) individual administered, standardized, nationally normed tests of intellectual ability and academic achievement; (3) three systematic observations in the classroom or other learning environment; (4) record review; (5) interviews with parent, pupil, and teacher; (6) health history review procedures; (7) a mental health screening; and (8) functional behavioral assessment.

Minn. R. 3525.1329, subp. 3. With respect to OHD, evaluators must include data from:

> (A) an individually administered, nationally normed standardized evaluation of the pupil's academic performance; (B) documented, systematic interviews conducted by a licensed special education teacher with classroom teachers and the pupil's parent or guardian; (C) one or more documents, systematic observations in the classroom or other learning environment by a licensed special education teacher; (D) a review of the pupil's health history, including the verification of a medical diagnosis of a health condition; and (E) records review.

Minn. R. 3525.1335, subp. 3. The law also provides a team-override provision, by which evaluators may override a determination that a student does not meet specific requirements for eligibility. Minn. R. 3525.1354, subp. 1. Schools districts use the team override to avoid situations where a student may not meet specific eligibility requirements under state law, but meets requirements under federal law.

The Court concludes, as did the ALJ, that the District's evaluations of the Student in the fall of 2017 were deficient under Minnesota law. The District concedes that it did not conduct any systematic observations of the Student in the classroom or an FBA. Although the Student's absenteeism was the primary barrier to conducting systematic observations, it has also been one of the most visible symptoms of the Student's disability.

Recognizing the issue of eligibility as central to this case, the ALJ and both parties have undertaken thorough analysis of the question. Federal law provides that a "child with a disability" is one who is evaluated as meeting at least one disability category listed in the IDEA and who, by reason of disability, needs special education and related services. 34 C.F.R. § 300.8(a)(1). One category of disability under federal law is emotional disturbance, which

> means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance: (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors; (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers; (C) Inappropriate types of behavior or feelings under normal circumstances; (D) A general pervasive mood of unhappiness or depression; (E) A tendency to develop physical symptoms or fears associated with personal or school problems.

*Id.* § 300.8(c)(4)(i). Another category of disability under federal law is other health impairment ("OHI"), which

> means having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that—(i) Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition,

hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and (ii) Adversely affects a child's educational performance.

*Id.* § 300.8(c)(9). "Special education" is defined as "specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including—

(i) Instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings. . . ." *Id.* § 300.39(a)(1). "Specially designed instruction" is defined as

adapting, as appropriate to the needs of an eligible child . . . the content, methodology, or delivery of instruction—(i) To address the unique needs of the child that result from the child's disability; and (ii) To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children.

*Id.* § 300.39(b)(3). Such specially designed instruction results in an "education program [that is] appropriately ambitious in light of [the child's] circumstances," helps a child "[p]rogress through this [education] system," and allows the child "the chance to meet challenging objectives." *Endrew F.*, 137 S. Ct. at 999-1000.

The Court concludes, as did the ALJ, that the Student is eligible for special education and related services under both federal and state eligibility guidelines. Specifically, the Student meets the federal and state definitions of both EBD and OHD. The Students' mental health issues—her several diagnoses as of May 2017—appear to have directly impacted her attendance at school. As the ALJ noted, there is no evidence in the record that anything but her mental health issues caused her absenteeism. (Decision at 49.) The District contends that the Student's mental health issues and absenteeism did not adversely impact her educational performance because she excelled

19

academically when she attended school.  For the same reasons the ALJ provided, the

Court also rejects this argument.  (*See id.* at 50.)  Specifically, special education is

designed to help students with disabilities progress in the general curriculum.  *See* 34

C.F.R. § 300.320.  No one disputes that the Student excelled on standardized tests;

neither can anyone dispute that her absenteeism inhibited her progress in the general

curriculum.

Accordingly, giving due weigh to the ALJ's treatment of this issue, the Court

affirms the ALJ's conclusions regarding eligibility.

## B. Child-Find Obligations

The District next challenges the ALJ's conclusion that the District did not fulfill

its child-find obligations, arguing that Defendants' child-find claim is time-barred and

that, nevertheless, the District complied with child-find requirements.

In order that all children with disabilities may receive a FAPE, the IDEA imposes

a "child find" obligation on school districts.  *See* 20 U.S.C. § 1412(a)(3).  Pursuant to this

obligation, districts have a duty to ensure that:

> All children with disabilities residing in the State . . . regardless of the
> severity of their disabilities, and who are in need of special education and
> related services, are identified, located, and evaluated and a practical
> method is developed to determine which children with disabilities are
> currently receiving needed special education and related services.

20 U.S.C. § 1412(a)(3)(A); *see also* Minn. R. § 3525.0750.  The IDEA defines children

with disabilities in part as those children who "need[ ] special education and related

services."  20 U.S.C. § 1401(3)(A)(ii).  The Supreme Court has recognized

the child find obligation as being of "paramount importance."  *Forest Grove Sch. Dist. v.*

*T.A.*, 557 U.S. 230, 245 (2009). And "[c]ourts around the country, including this one, have recognized that the IDEA's child find requirement imposes an 'affirmative duty' on school districts." *R.M.M. ex rel. T.M. v. Minneapolis Pub. Sch., Special Sch. Dist. No. 1*, Civ. Nos. 15-1627, 16-3085, 2017 WL 2787606, at *5 (D. Minn. June 27, 2017) (collecting cases).

The IDEA statute of limitations requires a parent to request a due process hearing within two years of "the date the parent . . . knew or should have known about the alleged action that forms the basis of the complaint . . . ." 20 U.S.C. § 1415(f)(3)(C); 34 C.F.R. § 300.511(e). The same two years are allotted to the parent to file an administrative complaint alleging a violation of the IDEA. 20 U.S.C. § 1415(b)(6)(B); 34 C.F.R. § 300.507(a)(2); *see also D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012). Under this framework, it is undisputed that because the Parents first requested a due process hearing on June 27, 2017, Defendants' claims would normally be limited to the District's conduct after June 27, 2015. *See D.K.*, 696 F.3d at 244.

The IDEA provides, however, that the statute of limitations "shall not apply to a parent" in two situations: (1) where the parent was prevented from requesting a hearing due to "specific misrepresentations by the local education agency that it had resolved the problem forming the basis of the complaint"; or (2) where the local educational agency withheld information from the parent that the law requires be provided to the parent. 20 U.S.C. § 1415(f)(3)(D). Before the ALJ, Defendants argued that at least the second of these exceptions applied here, noting that the Parents were not provided with notice of their procedural safeguards, as required by the IDEA, until June 2017. *See* 20

U.S.C. § 1415(d) (requiring a copy of the procedural safeguards be made available to the parents of a child with a disability).

On review of the record, the Court finds that the statute of limitations should not apply here because the District failed to provide an adequate and complete notice of procedural safeguards as required by the IDEA and by applicable regulations. Although the District discussed special education with the Parents prior to June 2017, the evidence shows that the Parents did not first receive a notice until that time. By withholding this critical information from the Parents, the District "denied [the Parents] the knowledge necessary to request a due process hearing." *El Paso Indep. Sch. Dist. v. Richard R.*, 567 F. Supp. 2d 918, 945 (W.D. Tex. 2008); *see also D.G. v. Somerset Hills Sch. Dist.*, 559 F. Supp. 2d 484, 492 (D.N.J. 2008) (applying the withholding exception because the school district failed to provide a proper notice of procedural safeguards).

The District argues that even if the child-find claims are viable, the District fulfilled its obligations. As previously noted, the ALJ determined that the District's efforts were insufficient to discharge its child-find duties. The record shows that the District was aware, no later than the spring of 2015, that the Student had stopped attending school because of her anxiety. The District admirably and appropriately engaged with the Parents concerning the Student's absences in eighth grade, including seeking information from the Student's therapists and other mental health providers. This involvement, however, is precisely what gave the District the reason to identify the Student as a possible child with a disability. By not acting on that information, the Court

concludes, as did the ALJ, that the District failed to fulfill its child-find obligations with respect to the Student.

Based on the foregoing, and giving due weight to the ALJ's analysis, the Court affirms the ALJ's conclusions regarding the District's child-find obligations.

### C.    Remedies

In reviewing an ALJ's decision, the Court has broad discretion to "grant such relief as the Court deems appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii); *see also C.B. ex rel. B.B. v. Special Sch. Dist. No. 1*, 636 F.3d 981, 987 (8th Cir. 2011) (reviewing challenge to award of reimbursement of private school tuition).  The Supreme Court has held that a district court's authority to grant "appropriate" relief includes "the power to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the [IDEA]."  *Sch. Comm. of Burlington v. Dep't of Ed.*, 471 U.S. 359, 369 (1985).

#### 1.    IEE and Dr. Reese Costs

The District argues that the ALJ erred in ordering reimbursement of outside professionals hired by the Parents to complete the Student's IEE because the underlying conclusions supporting the ALJ's order on reimbursement were erroneous.  (*See, e.g.*, Doc. No. 88 at 57.)  For example, the District explains that it did not conduct required classroom observations because the Student was at home nearly every day and rarely

attended school, and that the absence of classroom observations and a functional behavior assessment were harmless because the Student did not meet the other eligibility criteria.[1]

The Court disagrees. As the ALJ concluded, the Parents are entitled to reimbursement for IEE fees because the District's evaluation was deficient under Minnesota law. *See* 34 C.F.R. § 300.502(b).

The District also challenges the ALJ's conclusion that the Parents would not have incurred the cost of Dr. Reese's evaluation if the District had timely complied with its child-find obligations. (*Id.* at 59.) The District instead contends that Dr. Reese's evaluation was optional, that the Parents agreed to have it done, and that an outside psychological evaluation is not a required "related service" even if the District had earlier identified the Student as entitled to special education. (*Id.*) Had the District evaluated the Student for special education at an earlier date, it says, a qualified school psychologist on staff could have administered all of the assessments that Dr. Reese conducted. (*Id.*)

The District is correct that a qualified school psychologist likely could have administered all of the assessments that Dr. Reese conducted. Simply put, however, the District did not timely evaluate the Student for special education, and the Parents incurred the costs of Dr. Reese's evaluation as a result. The Court concludes, as did ALJ, that Defendants are entitled to reimbursement of the amounts they paid Dr. Reese for the May 2017 assessment.

---

[1]    The District evaluated the Student, but found no eligibility, for possible special eligibility in ASD, EBD, and OHD, and within the OHD category, evaluated the Student for ADHD and Generalized Anxiety Disorder.

2.     Private Services Costs

The District argues that the ALJ exceeded his authority by ordering, as compensatory education, the District to pay for private consultation and future services because there was no evidence that the District staff are incapable of providing the mandated services.  Defendants argue that the ALJ correctly concluded that they are entitled to retrospective and prospective private school expenses and other forms of compensatory education services.  (Doc. No. 92 at 40.)

Defendants correctly state that "[r]eimbursement for private school expenses may be an appropriate remedy whenever a school district has failed to provide a FAPE to a student, including when it has failed in its child find obligations, because those primary duties are so important."  (*Id.* (citing 20 U.S.C. § 1415(i)(2)(C)(iii); *Sch. Comm. of Burlington*, 471 U.S. at 369-70; *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 66 (1992); *C.B.*, 636 F.3d at 981).)  Here, although there is evidence in the record that the District failed to provide the Student a FAPE, there is scant evidence concerning whether the District can provide a FAPE prospectively.  Through the time of the Decision, the parties fundamentally disagreed as to whether the Student was a child with a disability entitled to special education and related services.  As a result, there was no evidence in the record as to whether the District can provide the type of specially designed education that Student is entitled to moving forward.  In sum, the present record does not support an award of prospective compensatory education in the form of payment for private service providers.

Based on the foregoing, and based on the Court's eligibility and child-find conclusions, the Court orders reimbursement of past private services provided by Heather Lindstrom, consistent with the Decision. (*See* Decision at 28 ¶ 5.) At this time, however, the Court reverses the provision in the Decision that orders "[f]uture payments for Lindstrom's services must be paid directly to Lindstrom, based on invoices provided by Lindstrom to the School District. All payments must be made within 30 calendar days of the School District's receipt of an invoice." (*Id.*)

### 3. Quarterly Meetings

The District asks the Court to set aside the ALJ's order requiring the Student's IEP team to meet quarterly, arguing that although "IEP Team meetings are important," "[t]he frequency of meetings should be driven by the circumstances at the time, not the rigid application of a quarterly meeting schedule. (Doc. No. 88 at 62.) The District further notes that the IDEA already mandates that IEP Team meetings be held "not less than annually," 34 C.F.R. § 300.324(b)(i), and that special educators' time is limited and valuable. (Doc. No. 88 at 62-63.) Giving due weigh to the ALJ's consideration of this remedy, and noting the ALJ's first-hand assessment that the District "unreasonably protracted this matter," the Court finds that requiring the Student's IEP team to meet quarterly is an appropriate remedy in light of all of the circumstances.

**ORDER**

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1.      Plaintiff Independent School District No. 283's Motion for Judgment on the Administrative Record (Doc. No. [85]) is **DENIED**.

2.      Defendants E.M.D.H., a minor, by and through her parents and next friends, L.H and S.D.'s Motion for Judgment on the Administrative Record (Doc. No. [89]) is **GRANTED IN PART, AS MODIFIED ABOVE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  January 15, 2019            <u>s/Donovan W. Frank</u>
                                        DONOVAN W. FRANK
                                        United States District Judge